LEWIS V LEGROW

Docket Nos. 234723, 234726, 234727. Submitted May 6, 2003, at Detroit. Decided August 21, 2003, at 9:05 A.M.

Jessica Lewis, Bethany L. Davis, and Amy Shemanski each brought an action in the Genesee Circuit Court, Judith A. Fullerton, J., against James F. LeGrow, a former boyfriend, after he secretly and without their consent videotaped each plaintiff engaging in consensual sex with the defendant. The plaintiffs alleged that the defendant violated MCL 750.539d, invaded their common-law right to privacy, and intentionally or recklessly inflicted emotional distress on them. A jury at a joint trial found in favor of the plaintiffs on all theories of liability, and substantial judgments were entered in favor of the plaintiffs. The defendant appealed each case, which appeals were consolidated, arguing that his bedroom, where the videotaping occurred, was not a "private place" for purposes of section 539d, that the act of videotaping the plaintiffs was not sufficiently outrageous, nor was his conduct intentional or reckless, to warrant submitting the plaintiffs' emotional distress claims to the jury, and that the trial court erred in admitting certain evidence during trial.

The Court of Appeals *held*:

1. Section 539d states that "[a]ny person who installs in any private place, without the consent of the person or persons entitled to privacy there, any device for . . . photographing . . . the . . . events in such place . . . is guilty of a felony." MCL 750.539a defines "private place" as "a place where one may reasonable [sic] expect to be safe from casual or hostile intrusion or surveillance but does not include a place to which the public or substantial group of the public has access." Here, the defendant's bedroom met the definition of a "private place" as one from which the general public is excluded. Further, a bedroom in a private home in which a couple engages in sexual relations, traditionally recognized as a private act, fulfills the definition of a "private place" because reasonable people would expect to be safe from "casual or hostile" intrusion or "surveillance" in a bedroom. Each of the plaintiffs testified that she was unaware of the taping and did not consent to being videotaped. The defendant's argument that his bedroom was not a private place because he was present and only videotaped what he

could also see fails because section 539d protects a "person or persons entitled to privacy" in a private place, and prohibits the defendant or "any person" from violating this protection. The fact that the plaintiffs consented to sexual intercourse with the defendant does not preclude them from bringing suit against the defendant.

2. The plaintiffs alleged claims of intrusion upon seclusion against the defendant, which claims focus on the manner in which private information is obtained, not on the information's publication. It is settled that sexual intimacy is a private subject matter that the plaintiffs had a right to keep private, and, on the evidence presented, a jury could find that the secret videotaping was objectionable to a reasonable person. However, the question whether the plaintiffs' consent to intercourse may have included express or implied consent to the videotaping was a question of fact for the jury. Thus, the trial court did not err in denying the defendant's motion for summary disposition and subsequent motion for a directed a verdict regarding the plaintiffs' claims of invasion of privacy.

3. The defendant argued that his mere videotaping of the plaintiffs, without publication to others, was not extreme and outrageous conduct, and that the plaintiffs did not show he intended to cause them distress. For purposes of satisfying the elements of an emotional distress claim, a plaintiff can show that the defendant specifically intended to cause distress or that the defendant's conduct was so reckless that any reasonable person would know that emotional distress would result. Viewing the evidence in a light most favorable to the plaintiffs, the trial court did not err in denying the defendant's motion for summary disposition and subsequent motion for a directed verdict, because reasonable jurors could find that a reasonable person would know that the plaintiffs would suffer emotional distress from the defendant's secretly taping the plaintiffs having sex with him, a significant breach of trust in itself, aside from whether the videotape was distributed to others.

4. Although marginally probative, the trial court did not abuse its discretion in admitting evidence that the defendant had a sexually transmitted disease, which one of the plaintiffs became infected with, because the evidence supported the plaintiffs' emotional distress claims in that the plaintiffs incurred greater distress by learning through the videotape that the defendant had more sexual partners.

5. The trial court did not abuse its discretion in admitting testimony by the defendant's sister that the defendant had a bad temper and had exhibited anger toward his sister when she refused to help the defendant retrieve the videotape in this case. The evidence was

relevant to the plaintiffs' emotional distress claims because it showed that the fear of the defendant the plaintiffs experienced after learning of the videotape was reasonable. The testimony by the defendant's brother that the defendant had yelled at one of the plaintiffs during an attempt to get the videotape back was admissible for the same reasons.

6. The defendant's brother's testimony implying that the defendant had once "peeped" at the brother while the brother was with his girlfriend at the defendant's house was inadmissible as improper character evidence. MRE 404(a), (b). The plaintiffs essentially argued that this evidence was relevant to show habit or routine, and that the evidence showed a scheme, plan, or system. In other words, that the evidence demonstrated that the defendant acted in accordance with his character as a voyeur in videotaping the plaintiffs. Although the trial court abused its discretion in admitting the evidence, reversal is not warranted because it was undisputed that the defendant videotaped the plaintiffs and the jury was presented with abundant evidence regarding whether the plaintiffs consented to the taping. The brother's testimony did not affect the outcome of the case, and the failure to grant the defendant relief is not inconsistent with substantial justice. MCR 2.613(A).

7. The trial court did not abuse its discretion in admitting testimony by the defendant regarding his prior wrongful discharge lawsuit in which he sought damages for emotional distress. The plaintiffs argued before trial that this evidence was relevant to their emotional distress claims because it showed that the defendant was aware that his actions could cause emotional distress. The trial court ruled that the evidence would not be admitted unless the defendant "opened the door" to such evidence by denying that emotional distress could arise without a physical cause. Defense counsel agreed to this ruling. The record reveals that the defendant testified that he did know what emotional distress was, and, therefore, opened the door to the plaintiffs' cross-examination of him regarding the prior lawsuit.

8. The defendant was not entitled to a jury instruction that the plaintiffs failed to mitigate their damages by discussing or telling others of the existence of the videotape, because the plaintiffs' claims against the defendant were not made on the basis that third parties either saw or heard about the videotape. Rather, each plaintiff claimed that the defendant's act of secretly videotaping them having sex was the basis of their claims under each theory of liability. Thus, the requested instruction was inapplicable, and the trial

court did not err in refusing to read the mitigation instruction. M Civ JI 53.05.

Affirmed.

HOEKSTRA, J., concurring, stated that he agreed with the majority opinion in all respects, except portions of the opinion addressing the relevancy of certain evidence, but concurred in the result because declining to grant relief was not inconsistent with substantial justice.

CRIMINAL LAW — INSTALLATION OF DEVICES FOR OBSERVING, PHOTOGRAPHING, OR EAVESDROPPING IN PRIVATE PLACES.

The bedroom of a private home in which persons engaged in private, sexual relations is a "private place" for purposes of the statute that makes it a felony to install any device for observing, photographing, or eavesdropping on the sounds or events occurring in a private place without the consent, of the person or persons entitled to privacy there. (MCL 750.539d; 750.539a[1].)

*Michael J. Kelly* for Jessica Lewis.

*Chapman Hardin, P.L.L.C.* (by *Kenneth J. Hardin*), for Bethany L. Dennis.

*Leonard B. Shulman* and *Ted E. Bean* for Amy Shemanski.

*O'Neill, Wallace & Doyle, P.C.* (by *Charles F. Filipiak*), for James F. LeGrow.

Before: MARKEY, P.J., and CAVANAGH, and HOEKSTRA, JJ.

MARKEY, P.J. This case involves the surreptitious, nonconsensual videotaping of intimate acts of sexual relations in defendant James F. LeGrow's bedroom. After a joint trial, a jury found that defendant violated MCL 750.539d, invaded plaintiffs Jessica Lewis, Bethany L. Dennis, and Amy Shemanski's common-law right to privacy, and intentionally or recklessly inflicted emotional distress. Defendant argues on appeal that because plaintiffs willingly exposed them-

selves while having sex with him, his bedroom was not a "private place" under § 539d, nor could he intrude on their privacy. Further, defendant argues that secretly videotaping himself having sex with plaintiffs was not sufficiently outrageous, nor was his conduct intentional or reckless, to warrant submitting plaintiffs' claims of intentional infliction of emotional distress to the jury. Finally, defendant argues that the trial court denied him a fair trial by erroneously admitting certain evidence and by failing to give a requested jury instruction. We conclude, in this case of first impression, that defendant's bedroom is a "private place" within the plain meaning of § 539d, and that plaintiffs presented sufficient evidence to survive dismissal on all theories of liability. Finally, we conclude there was no error committed during trial warranting reversal.

## I. MATERIAL FACTS AND PROCEEDINGS

Each plaintiff dated defendant at various times. Shemanski met defendant when she bought the house next to his in May 1996. She and defendant dated periodically for about three years starting in August 1996. In April 1999, Shemanski found a plastic bag on her side door. Inside was an unlabeled videotape, which Shemanski soon discovered showed each plaintiff having sex with defendant in his bedroom. Shemanski remembered the day defendant videotaped them having sex and recalled seeing a video camera on defendant's dresser that was partially covered with clothes. Shemanski testified that she did not know the video camera was on and she did not consent to defendant's videotaping them having sex.

Lewis began dating defendant in August 1996, and their relationship became serious in October 1996. Lewis ended her relationship with defendant in June 1997 when she became suspicious that he was seeing another woman. On August 7, 1999, Lewis received a telephone call from defendant, who asked her whether Shemanski had called her. Defendant told Lewis that Shemanski had a videotape of Lewis and defendant having sex, which defendant told her he had made while they were dating. The next day, Lewis called Shemanski to get the videotape. Lewis ultimately took the videotape to the Burton Police Department. Lewis testified that she never consented to being videotaped having sex with defendant.

Dennis began dating defendant in October 1992. They had a sporadic relationship for 5½ years, which finally ended in July 1998. After their relationship ended, Dennis had occasional contact with defendant until September 1999, when she received a telephone call from the police advising her that they had a videotape that depicted three people having sexual relations with defendant. The officer told Dennis that the police knew who two of the people were, and they thought that the third person was Dennis. Dennis confirmed she was the third person and testified that she was unaware that defendant videotaped her.

All plaintiffs testified to experiencing emotional distress after they learned about the videotape. For example, Dennis testified:

> I was very hurt. I think that was what was [sic] my initial reactions . . . that somebody that loved me could do this kind of thing to me . . . and I had a lot of anxiety . . . because this had happened. It was something that I couldn't fix. . . . I was scared about what was going on with this tape. . . . I didn't know how many people had seen it, how

many tapes there were . . . if there were other copies, if he
had shown it to anybody, whether people had a tape, any-
thing . . . it could have been out on the Internet, you know,
I was just very . . . humiliated.

Dennis also claimed that she thinks about the vide-
otaping several times a day and that her preoccupa-
tion with the ordeal has sparked numerous physical
injuries. Dennis testified:

I wake up in the middle of the night, you know, I wake
up probably two, three o'clock in the morning . . . just wide
awake like, "Oh, my God, something's wrong," and just like,
"What's going on?" . . . . Just before the tape came out I—I
started a new job and . . . I know that I haven't been a hun-
dred percent [at this new job] 'cause it's a distraction, but
when you sit down at your computer and I start thinking
about it and I have—have a hard time concentrating. . . . I
find myself not being able to remember things. . . . I've been
very stressed about it. . . . I think this part of the reason
why, you know, I don't sleep good at night.

Lewis presented the testimony of her gynecologist,
Dr. Sheryl Hinton, who noted that Lewis was suffer-
ing from posttraumatic stress syndrome because of
the videotaping.

Defendant testified that each plaintiff consented to
being videotaped. He claimed that he put all the vide-
otapes depicting him having sex with plaintiffs in a
shoebox in his closet. Defendant testified that he
never showed the videotapes to anyone or told any-
one about them. Indeed, he believed that he either
destroyed or recorded over each of them. However,
defendant testified that his house was broken into
and ransacked in September of 1998. Because clothes
and other gifts that defendant's then girlfriend had
given him were missing, defendant believed that it
was she who had broken into his house. Defendant

also believed that whoever broke into his house stole the videotapes and placed one of them on Shemanski's door. Defendant claimed he did not notice that the videotapes were missing because he thought that he had destroyed them.

The jury found in favor of each plaintiff against defendant on all theories of liability: violating § 539d, invasion of privacy, and intentional infliction of emotional distress. The jury awarded Dennis $100,000 for past and present emotional distress, mental anguish, fright, shock, denial of social pleasure, embarrassment, or mortification; $1,120 for medical expenses; $50,000 for future emotional distress, mental anguish, fright, shock, denial of social pleasure, embarrassment, or mortification; and $4,000 for future medical expenses. The jury awarded Lewis $75,000 for past and present emotional distress, mental anguish, fright, shock, denial of social pleasure, embarrassment, or mortification, and $25,000 in future damages. The jury awarded Shemanski $50,000 for past and present emotional distress, mental anguish, fright, shock, denial of social pleasure, embarrassment, or mortification, and $50,000 in future damages. The trial court entered final judgments for plaintiffs, adding taxable costs and interest, and adjusting the awards of future damage by five percent to reflect present value.

Defendant appeals by right. This Court denied defendant's motion for peremptory reversal on April 11, 2002.

## II. MCL 750.539d

Defendant first argues that secretly videotaping consensual sexual activity that includes oneself in one's own bedroom does not violate § 539d because a

bedroom is not a "private place" within the meaning of the statute. We disagree.

A. STANDARD OF REVIEW

The interpretation and application of a statute is a question of law we review de novo. *Eggleston v Bio-Medical Applications of Detroit, Inc*, 468 Mich 29, 32; 658 NW2d 139 (2003). We apply the following rules in construing the statute. Our primary goal is to ascertain and effectuate the intent of the Legislature. *In re MCI Telecom Complaint*, 460 Mich 396, 411; 596 NW2d 164 (1999). In doing so, we first review the specific wording of the statute itself. *Id.* If the plain and ordinary meaning of the language of the statute is clear and unambiguous, judicial construction is neither required nor permitted. *Id.* Further, unless defined in the statute, every word or phrase of a statute should be accorded its plain and ordinary meaning, considering the context in which the words are used. *Robertson v DaimlerChrysler Corp*, 465 Mich 732, 748; 641 NW2d 567 (2002). A dictionary may be consulted to determine the meaning of undefined words, *People v Stone*, 463 Mich 558, 563; 621 NW2d 702 (2001), but otherwise the statutory definition controls, *Robertson, supra.*

Section 539d, together with MCL 750. 539i, creates a criminal and civil cause of action for invasion of privacy, which Michigan has long recognized as a common-law tort. *Beaumont v Brown*, 401 Mich 80, 93-95; 257 NW2d 522 (1977), overruled on other grounds, *Bradley v Saranac Community Schools Bd of Ed*, 455 Mich 285; 565 NW2d 650 (1997); *DeMay v Roberts*, 46 Mich 160; 9 NW 146 (1881). We presume that the Legislature is aware of the common law that

legislation will affect; therefore, if the express language of legislation conflicts with the common law, the unambiguous language of the statute must control. *Bennett v Weitz*, 220 Mich App 295, 299; 559 NW2d 354 (1996); *Barker Bros Constr v Bureau of Safety & Regulation*, 212 Mich App 132, 140; 536 NW2d 845 (1995). On the other hand, if an ambiguity exists in such a statute, the language of the statute must be read in light of the previously established rules of common law. *Nummer v Dep't of Treasury*, 448 Mich 534, 544; 533 NW2d 250 (1995); *B & B Investment Group v Gitler*, 229 Mich App 1, 7; 581 NW2d 17 (1998). Thus, when the Legislature uses a word or phrase that has acquired a unique meaning at common law, it is interpreted to have the same meaning when used in a statute dealing with the same subject. *People v Riddle*, 467 Mich 116, 125-126; 649 NW2d 30 (2002); *Pulver v Dundee Cement Co*, 445 Mich 68, 75; 515 NW2d 728 (1994). Moreover, well-settled common-law principles are not abolished by implication. Accordingly, when an ambiguous statute contravenes common law, it must be interpreted in a manner that least affects the common law. *Marquis v Hartford Accident & Indemnity (After Remand)*, 444 Mich 638, 652-653; 513 NW2d 799 (1994); *Houghton Lake Area Tourism & Convention Bureau v Wood*, 255 Mich App 127, 149; 662 NW2d 758 (2003).

B. ANALYSIS

Section 539d provides:

Any person who installs in any private place, without the consent of the person or persons entitled to privacy there, any device for observing, photographing, or eavesdropping

upon the sounds or events in such place, or uses any such unauthorized installation, is guilty of a felony . . . .

MCL 750.539a provides the definitions of phrases used in MCL 750.539:

(1) "Private place" means a place where one may reasonable [sic] expect to be safe from casual or hostile intrusion or surveillance but does not include a place to which the public or substantial group of the public has access.

(2) "Eavesdrop" or "eavesdropping" means to overhear, record, amplify or transmit any part of the private discourse of others without the permission of all persons engaged in the discourse. . . .

(3) "Surveillance" means to secretly observe the activities of another person for the purpose of spying upon and invading the privacy of the person observed.

Initially, we note that eavesdropping is not at issue in this case. MCL 750.539c prohibits eavesdropping, but that prohibition is limited by subsection 539a(2) to overhearing, recording, amplifying, or transmitting the private *discourse of others* without the permission of all persons engaged in the *discourse*. The statute does not define "discourse," but its ordinary dictionary definition is "communication of thought by words; talk; conversation; . . . any unit of connected speech or writing longer than a sentence." *Random House Webster's College Dictionary* (1992), p 384. Thus, "eavesdropping" is limited to overhearing, recording, amplifying, or transmitting the private, oral, or written communication *of others* without the permission of all persons engaged in the communication. For that reason, a participant in a private conversation may record it without "eavesdropping" because the conversation is not the "discourse of others." *Sullivan v Gray*, 117 Mich App 476, 481; 324 NW2d 58 (1982).

Section 539d extends beyond eavesdropping on the private conversations of others to prohibit installing or using any device to observe or photograph the sounds or events in "any private place, without the consent of the person or persons entitled to privacy there . . . ." Because the Legislature did not define the word "install," reliance on its dictionary definition of "to place in position or connect for service or use," *Random House Webster's College Dictionary* (1992), p 698, is proper. As applied to the case at bar, to position a video camera and to partially conceal it with clothing for the purpose of recording "the sounds or events" (consensual sexual activity) occurring in a bedroom of a private home is clearly prohibited by § 539d, provided defendant's bedroom is a "private place" as defined by subsection 539a(1), and plaintiffs were persons entitled to privacy there.

In *People v Abate*, 105 Mich App 274; 306 NW2d 476 (1981), this Court construed the term "private place" as it is used in § 539d. In *Abate*, the defendant installed two-way mirrors above the women's restroom at the defendant's roller skating rink so that an observer could see inside the stalls. *Id.* at 276. The walls of the stalls and the door, which could be latched shut, extended from fourteen inches off the floor to high enough that a person of average height could not see over the top. *Id.* This Court noted from the language of subsection 539a(1) that a "private place" must afford protection from two alternative types of intrusion, "casual or hostile intrusion" *or* "surveillance," *and* that it must not be "a place to which the public or a substantial group of the public has access." *Id.* at 277-279. Thus, "to qualify as a private place . . . the area must be one in which a reasonable person would expect not to be disturbed by

the appearance of another person or be subject to surveillance [and] [t]he area also must not be one to which the general public has access." *Id.* at 277. Because the restroom stalls in *Abate* were designed to exclude the general public and to protect an occupant from casual intrusions when the stalls were closed and locked, each stall was a "private place" within the meaning of the statute. *Id.* at 278-279. Likewise, because users of the stalls could "reasonably expect to be protected from secret observations" during their use, the alternate definition of "private place" was also satisfied. *Id.* at 279.

In *Abate*, this Court relied heavily on Fourth Amendment jurisprudence, particularly *Rakas v Illinois*, 439 US 128; 99 S Ct 421; 58 L Ed 2d 387 (1978), and *Katz v United States*, 389 US 347; 88 S Ct 507; 19 L Ed 2d 576 (1967), in applying the reasonable expectation of privacy test to § 539a. *Abate, supra* at 277-278. Later, this Court recognized it was error to blindly import Fourth Amendment analysis into the analogous common-law tort of invasion of privacy. *Doe v Mills*, 212 Mich App 73, 85-86; 536 NW2d 824 (1995) (The trial court erred by "relying on cases construing the Fourth Amendment as a basis for concluding that plaintiffs had somehow lost their common-law privacy rights" because the private information at issue was found in the trash.). Moreover, in a criminal case reviewing the eavesdropping statute, § 539c, our Supreme Court held that the Legislature, by its definition of "private place" in subsection 539a(1), intended "that private places are places where a person can reasonably expect privacy . . . ." *Stone, supra* at 563. The Court cautioned that its interpretation of the statute flowed from the language the Legislature used, not Fourth Amendment jurisprudence. *Id.* at 564. Fur-

ther, the Court in *Stone* observed that under Michigan's eavesdropping statute, "whether a person can reasonably expect privacy in a conversation generally will present a question of fact." *Id.* at 566.

Here, there is no question that defendant's bedroom meets the required definition of a "private place" as one from which the general public is excluded. Likewise, plaintiffs did not claim, nor could they, that they were safe from defendant's observation while engaging in consensual sex with him. Indeed, defendant's observation of plaintiffs during their intimate sexual activities was neither casual nor hostile, nor was his observation secret within the meaning of "surveillance" as defined in subsection 359a(3). Nevertheless, a bedroom in a private home in which a couple engages in intimate relations fulfills the definition of a "private place" under subsection 539a(1) because reasonable people expect to be "to be safe from casual or hostile intrusion" within a bedroom. *Abate, supra* at 278. Moreover, reasonable people engaged in sexual relations in a bedroom of a private home expect to be free from "surveillance," § 539a(3), i.e., from being secretly spied on and having their privacy invaded. The Legislature has not defined what constitutes an invasion of privacy, but when interpreted in light of the common-law right to privacy, *Riddle, supra* at 125-126, it is clear that it includes keeping sexual relations private. This Court, quoting from the Restatement of Torts, has opined concerning the common-law right to privacy:

"Every individual has some phases of his life and his activities and some facts about himself that he does not expose to the public eye, but keeps entirely to himself or at most reveals only to his family or to close personal friends. Sexual relations, for example, are normally entirely private

matters." [*Doe, supra* at 82, quoting 3 Restatement Torts, 2d, § 652D, comment b, p 386.]

Defendant argues that his bedroom is not a private place within the meaning of § 359d because he was present and only videotaped what he could also see. Defendant's argument fails because the statute patently protects a "person or persons entitled to privacy" in a private place. MCL 750.539d. The statute does not protect against defendant's unaided sight or hearing but, rather, prohibits defendant or "any person" from installing or using a device (video camera), "in any private place" (defendant's bedroom), "for . . . photographing . . . the . . . events in such place" (sexual relations), "without the consent of the person or persons entitled to privacy there" (plaintiffs). *Id.* There is a vast difference between knowingly exposing oneself to one's partner during consensual sex and having that intimate event secretly photographed and, thus, " 'captured and preserved for all time.' " *Dickerson v Raphael*, 222 Mich App 185, 188; 564 NW2d 85 (1997), rev'd on other grounds 461 Mich 851 (1999), quoting *People v Hall*, 88 Mich App 324, 330; 276 NW2d 897 (1979). The essence of 539d is to protect against the secret, nonconsensual photographing of an event in a place where the person secretly photographed would reasonably expect to be safe from such "surveillance." MCL 750.539a(3). Just as "a participant [in a private conversation] may not unilaterally nullify other participants' expectations of privacy by secretly broadcasting the conversation," *Dickerson, supra*, 461 Mich at 851, defendant may not unilaterally nullify his sexual partners' expectations of privacy by clandestinely videotaping them.

Our analysis of the statute to this point is based on the plain language of the statute, aided at times by dictionary definitions and terms of art from the common law. To the extent the statute is ambiguous, our analysis is buttressed by the principles that the language of a statute should be read in light of previously established rules of common law, *B & B Investment Group*, *supra* at 7, and interpreted so that it least changes the common law, *Marquis*, *supra* at 652-653; *Houghton Lake Area Tourism*, *supra* at 149. Specifically, our analysis is consistent with *DeMay*, *supra*, the case giving rise to the common-law action for "invasion of privacy" in Michigan and elsewhere. *Beaumont*, *supra* at 93-95. In *DeMay*, the plaintiff's privacy was intruded upon when, during childbirth, she consented to the presence of a third person with the doctor believing he was a medical student or medical assistant, when in fact he was neither. Our Supreme Court opined:

> It would be shocking to our sense of right, justice and propriety to doubt even but that for such an act the law would afford an ample remedy. To the plaintiff the occasion was a most sacred one and no one had a right to intrude unless invited or because of some real and pressing necessity which it is not pretended existed in this case. The plaintiff had a legal right to the privacy of her apartment at such a time, and the law secures to her this right by requiring others to observe it, and to abstain from its violation. The fact that at the time, she consented to the presence of Scattergood supposing him to be a physician, does not preclude her from maintaining an action and recovering substantial damages upon afterwards ascertaining his true character. [*DeMay*, *supra* at 165-166.]

Thus, interpreting § 359d in light of the common law, plaintiffs' consenting to have sex with defendant in a private place does not preclude them from main-

taining an action and recovering substantial damages upon learning that defendant had surreptitiously photographed intimacies that plaintiffs reasonably expected be kept private. Of course, there can be no tort liability pursuant to § 539d, for common law invasion of privacy or intentional infliction of emotional distress, if plaintiffs expressly or impliedly consented to being videotaped while having sex with defendant. *Smith v Calvary Christian Church*, 462 Mich 679, 689; 614 NW2d 590 (2000); *DeMay, supra* at 164. In sum, this case presented a factual question whether plaintiffs' consent to engage in sexual activity included express or implied consent to be photographed (videotaped) while having sex in a "private place," defendant's bedroom. See, e.g., *Stone, supra* at 566 (whether a person can reasonably expect privacy in a conversation generally will present a question of fact). Here, the jury found that plaintiffs did not consent to being secretly videotaped and properly concluded that defendant violated § 539d.

### III. INVASION OF PRIVACY AND INTENTIONAL OR RECKLESS INFLICTION OF EMOTIONAL DISTRESS

Defendant next argues that the trial court erred, first by denying his motion for summary disposition on plaintiffs' claims that he invaded plaintiffs' seclusion and intentionally or recklessly inflicted emotional distress, and then by not directing a verdict in his favor because each plaintiff consented to having sex with him. Defendant argues that he could not have invaded plaintiffs' privacy, and that the intentional or reckless element of plaintiffs' emotional distress claims were not satisfied. We disagree.

### A. STANDARD OF REVIEW

A trial court's decision regarding a motion for summary disposition and a motion for a directed verdict are reviewed de novo. *Spiek v Dep't of Transportation*, 456 Mich 331, 337; 572 NW2d 201 (1998); *Derbabian v S & C Snowplowing, Inc*, 249 Mich App 695, 701; 644 NW2d 779 (2002). Although defendant filed his motion for summary disposition pursuant to MCR 2.116(C)(8) and (C)(10), the parties utilized evidence outside the pleadings. Consequently, we review the trial court's decision regarding defendant's motion for summary disposition pursuant to MCR 2.116(C)(10). *Driver v Hanley (After Remand)*, 226 Mich App 558, 562; 575 NW2d 31 (1997). A motion for summary disposition under MCR 2.116(C)(10) tests whether there is factual support for a claim, *Spiek, supra,* and may be granted only when, except as to the amount of damages, there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. When deciding a motion for summary disposition, a court must consider the pleadings, affidavits, depositions, admissions, and other documentary evidence submitted in a light most favorable to the nonmoving party. *Ritchie-Gamester v City of Berkley*, 461 Mich 73, 76; 597 NW2d 517 (1999).

Similarly, regarding defendant's motion for a directed verdict, "we view the evidence presented up to the time of the motion in the light most favorable to the nonmoving party, granting that party every reasonable inference, and resolving any conflict in the evidence in that party's favor to decide whether a question of fact existed." *Derbabian, supra* at 702. A directed verdict may be granted only when no factual

question exists regarding which reasonable jurors could differ. *Meagher v Wayne State Univ*, 222 Mich App 700, 708; 565 NW2d 401 (1997).

### B. INVASION OF PRIVACY

Michigan has long recognized the common-law tort of invasion of privacy. *Beaumont v Brown*, 65 Mich App 455, 460; 237 NW2d 501 (1975), rev'd on other grounds 401 Mich 80 (1977). Over the years, the action has evolved into four distinct tort theories: (1) the intrusion upon another's seclusion or solitude, or into another's private affairs; (2) a public disclosure of private facts about the individual; (3) publicity that places someone in a false light in the public eye; and (4) the appropriation of another's likeness for the defendant's advantage. *Id.* at 461, citing Prosser, *Privacy*, 48 Cal L Rev 383, 389 (1960); see also *Doe, supra* at 80. Here, plaintiffs advanced the theory of intrusion upon their seclusion. "There are three necessary elements to establish a prima facie case of intrusion upon seclusion: (1) the existence of a secret and private subject matter; (2) a right possessed by the plaintiff to keep that subject matter private; and (3) the obtaining of information about that subject matter through some method objectionable to a reasonable man." *Id.* at 88.

An action for intrusion upon seclusion focuses on the manner in which the information was obtained, not on the information's publication. *Tobin v Civil Service Comm*, 416 Mich 661, 672-674; 331 NW2d 184 (1982); *Doe, supra* at 88-90. In this respect, the claim is analogous to a trespass, except that a physical intrusion of property is unnecessary. *Duran v Detroit News, Inc*, 200 Mich App 622, 630; 504 NW2d 715

(1993). Therefore, the fact that defendant may not have published the videotapes to another person is irrelevant. See, e.g., *Harkey v Abate*, 131 Mich App 177, 181-182; 346 NW2d 74 (1983), in which this Court held that the installation of two-way mirrors to permit viewing into public restroom stalls at the defendant's roller-skating rink was sufficient to establish a prima facie case that defendant invaded the plaintiffs' right to privacy without having presented proof that defendant actually viewed the plaintiffs inside the restroom stalls.

Like other torts, there can be no invasion of privacy under the theory of intrusion upon the seclusion of plaintiffs if plaintiffs consented to defendant's intrusion (videotaping). *Smith, supra* at 689; *DeMay, supra* at 164. In the context of invasion of privacy, express or implied consent is often referred to as a waiver of the right to privacy. *Doe, supra* at 86; *Earp v Detroit*, 16 Mich App 271, 278 n 5; 167 NW2d 841 (1969). The question of waiver or consent, however, does not have a zero-sum answer but, rather, presents an issue of the degree or extent of waiver or consent granted, which depends on the facts and circumstances of the case. *Id.* Thus, in *DeMay, supra*, the scope of the plaintiff's consent extended only to the presence of any necessary physician's assistants. The deceitful presence of a medically unqualified, unnecessary person entitled the plaintiff to recover damages upon discovery of the true state of affairs. *Id.* at 166. This Court opined in *Earp, supra*:

"The right of privacy may be waived by the individual or by anyone authorized by him, and this waiver may be either express or implied. . . . The existence of a waiver carries with it the right to an invasion of privacy only to such an extent, however, as may be legitimately necessary and

proper in dealing with the matter which has brought about the waiver, or, as otherwise stated, only to the extent warranted by the circumstances which brought about the waiver." [*Id.* at 278 n 5, quoting 77 CJS, Right of Privacy, § 6, pp 413, 414.]

Although waiver or consent may be implied, "an implied waiver requires a 'clear, unequivocal, and decisive act of the party showing such a purpose.' " *Doe, supra* at 87, quoting 62A Am Jur 2d, Privacy, § 226, p 836. Generally, the scope of a waiver or consent will present a question of fact for the jury, *DeMay, supra* at 164, unless reasonable minds cannot disagree that the plaintiffs consented to the activity about which they complain, *Smith, supra* at 689.

Here, the essential evidence plaintiffs produced at the time of defendant's motion for summary disposition and the evidence they presented up to the time of defendant's motion for a directed verdict was substantially the same. It was undisputed that each plaintiff engaged in consensual sexual relations with defendant in his bedroom at his home. However, each plaintiff testified that defendant surreptitiously videotaped her without her consent while engaged in sexual activities with defendant. Although reasonable minds could not disagree that consensual sex would include implied consent to allow defendant access during sexual activity, the evidence, when viewed in the light most favorable to plaintiffs, presented a factual question on which reasonable minds could differ with respect to whether the scope of plaintiffs' consent included videotaping the sexual activity. It is settled that sexual intimacy is a private subject matter that plaintiffs have a right to keep private. *Doe, supra* at 82. Further, on the evidence presented, a jury could find that the surreptitious, nonconsensual vide-

otaping of intimate acts is objectionable to a reasonable person. Thus, this case presented a factual question regarding whether plaintiffs' consent to engage in sexual activity included express or implied consent to be videotaped while having sex with defendant. The trial court did not err in denying defendant's motion for summary disposition before trial, or by denying defendant's motion for directed verdict. *Derbabian, supra* at 701-702.

### C. INTENTIONAL OR RECKLESS INFLICTION OF EMOTIONAL DISTRESS

In order to establish intentional or reckless infliction of emotional distress, a plaintiff must show "(1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress." *Graham v Ford*, 237 Mich App 670, 674; 604 NW2d 713 (1999); *Linebaugh v Sheraton Michigan Corp*, 198 Mich App 335, 342; 497 NW2d 585 (1993). Liability attaches only when a plaintiff can demonstrate that the defendant's conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Id.* A defendant is not liable for "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Doe, supra* at 91.

The test to determine whether a person's conduct was extreme and outrageous is whether recitation of the facts of the case to an average member of the community " 'would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!" ' " *Graham, supra* at 674-675, quoting *Roberts v Auto-Owners Ins Co*, 422 Mich 594, 603; 374 NW2d 905 (1985), quoting Restatement Torts, 2d, § 46, comment d,

pp 72-73. In reviewing claims of intentional or reckless infliction of emotional distress, it is generally the trial court's duty to determine whether a defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery. *Doe, supra* at 92. Where reasonable minds may differ, whether a defendant's conduct is so extreme and outrageous as to impose liability is a question for the jury. *Id.; Linebaugh, supra* at 343.

Defendant argues that the trial court erred in denying his motion for summary disposition of plaintiffs' claim of intentional or reckless infliction of emotional distress. Defendant contends that the mere videotaping of plaintiffs having sex with him, without publication or distribution to others, was not so outrageous as to warrant submitting those claims to the jury. Further, defendant argues that plaintiffs did not show that defendant intended to inflict emotional distress.

The second element of the tort of intentional or reckless infliction of emotional distress may be proved two ways. A plaintiff can show that a defendant specifically intended to cause a plaintiff emotional distress or that a defendant's conduct was so reckless that " 'any reasonable person would know emotional distress would result.' " *Haverbush v Powelson,* 217 Mich App 228, 236-237; 551 NW2d 206 (1996). Defendant admitted videotaping each plaintiff having sex with him, and each plaintiff denied consenting to such videotaping. Viewing the evidence in a light most favorable to the nonmoving plaintiffs, the trial court did not err in denying defendant's motion for summary disposition on this issue because reasonable jurors could find that a reasonable person would conclude that plaintiffs would suffer emotional distress from defendant's secretly videotaping plaintiffs

having sex with him. The act of secretly videotaping plaintiffs, aside from considerations of distribution, is deceptive and a significant breach of trust. A reasonable person could conclude that such an act would cause emotional distress.

Next, defendant argues that the trial court erred in denying his motion for a directed verdict at the close of plaintiffs' proofs. "In reviewing a trial court's decision regarding a motion for a directed verdict, this Court views the evidence presented up to the time of the motion in the light most favorable to the nonmoving party, grants that party every reasonable inference, and resolves any conflict in the evidence in that party's favor to decide whether a question of fact existed." *Hatfield v St Mary's Medical Ctr*, 211 Mich App 321, 325; 535 NW2d 272 (1995). Here, the evidence presented, viewed in a light most favorable to plaintiffs, indicated that defendant secretly and without their consent, videotaped each plaintiff having sex with him. Each plaintiff testified that she suffered emotional distress upon discovery of the videotape, and a reasonable person could conclude that plaintiffs would suffer emotional distress from the videotaping.

Therefore, because factual questions existed regarding which reasonable minds could differ, the trial court did not err in denying defendant's motions for summary disposition and for a directed verdict regarding plaintiffs' claims of intentional or reckless infliction of emotional distress.

IV. THE TRIAL COURT'S EVIDENTIARY DECISIONS

Defendant argues that he was denied a fair trial by the cumulative effect of four evidentiary errors result-

ing in the admission of irrelevant evidence, MRE 401; MRE 402, or if the evidence was relevant, its probative value was substantially outweighed by the danger of unfair prejudice, MRE 403. Although we agree that the trial court abused its discretion by admitting "peeping Tom" evidence, we disagree that the error merits reversal. MCR 2.613(A).

### A. STANDARD OF REVIEW

Under Michigan's rules of evidence, all logically relevant evidence is admissible at trial, except as otherwise prohibited by the state or federal constitutions or other court rules. MRE 402; *Waknin v Chamberlain*, 467 Mich 329, 333; 653 NW2d 176 (2002). Evidence is relevant if it has any tendency to make the existence of a fact that is of consequence to the action more probable or less probable than it would be without the evidence. MRE 401; *Waknin, supra.* The trial court has discretion to exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or needless presentation of cumulative evidence. MRE 403; *Waknin, supra* at 334. However, in applying MRE 403, "unfair prejudice" does not mean "damaging," *People v Mills*, 450 Mich 61, 75; 537 NW2d 909, modified and remanded 450 Mich 1212 (1995). " 'Rule 403 does not prohibit prejudicial evidence; only evidence that is unfairly so. Evidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury.' " *Waknin, supra* at 334 n 3, quoting *People v Crawford*, 458 Mich 376, 398; 582 NW2d 785 (1998).

A trial court's ruling regarding the admission of evidence is reviewed for an abuse of discretion. *Waknin, supra* at 332; *Barrett v Kirtland Community College,* 245 Mich App 306, 325; 628 NW2d 63 (2001). An abuse of discretion is found only in the extreme case where the result is so palpably and grossly contrary to fact and logic that it evidences a perversity of will, a defiance of judgment, or the exercise of passion or bias, *id.,* or where an unprejudiced person, considering the facts on which the trial court acted, would say that there was no justification or excuse for the ruling made, *Ellsworth v Hotel Corp of America,* 236 Mich App 185, 188; 600 NW2d 129 (1999). A decision on a close evidentiary question ordinarily cannot be an abuse of discretion. *Peña v Ingham Co Rd Comm,* 255 Mich App 299, 303-304; 660 NW2d 351 (2003). A trial court error in admitting or excluding evidence will not merit reversal unless a substantial right of a party is affected, MRE 103(a); *Ellsworth, supra,* and it affirmatively appears that failure to grant relief is inconsistent with substantial justice, MCR 2.613(A); *Chastain v Gen Motors Corp,* 467 Mich 888; 654 NW2d 326 (2002); *Miller v Hensley,* 244 Mich App 528, 531; 624 NW2d 582 (2001).

In order for cumulative evidentiary error to mandate reversal, consequential errors must result in substantial prejudice that denies the aggrieved party a fair trial. *Hickey v Zezulka,* 177 Mich App 606, 623; 443 NW2d 180 (1989), rev'd on other grounds 439 Mich 408 (1992), amended 440 Mich 1203 (1992); *Haynes v Seiler,* 16 Mich App 98, 103; 167 NW2d 819 (1969). See also *People v Knapp,* 244 Mich App 361, 387-388; 624 NW2d 227 (2001), and *Gore v Rains & Block,* 189 Mich App 729, 744; 473 NW2d 813 (1991) (there can be no cumulative effect where there are no

errors). Thus, actual errors must combine to cause substantial prejudice to the aggrieved party so that failing to reverse would deny the party substantial justice. MCR 2.613(A); *Miller, supra* at 531.

### B. ANALYSIS

Before trial, defendant moved to exclude evidence in four areas: (1) that defendant and at least one plaintiff had a sexually transmitted disease (STD); (2) testimony by defendant's brother and sister that defendant had a temper and that his sister attempted to obtain a personal protection order (PPO) against defendant; (3) testimony by defendant's brother that implied that defendant surreptitiously spied on his brother while he was with a girlfriend; and (4) evidence that defendant filed a lawsuit alleging wrongful discharge that sought damages for emotional distress. Because the first two evidentiary topics were arguably relevant to plaintiffs' emotional state, including fear and anxiety, after learning that defendant had secretly videotaped private sex acts, we cannot conclude that the trial court abused its discretion. *Peña, supra; Ellsworth, supra.* Fear is an emotion that can aggravate other emotions such as humiliation, disgust, and anger. Emotional distress was the key element of plaintiffs' claim for damages. The claimed error of permitting plaintiffs to inquire into defendant's prior lawsuit was waived by defense counsel's agreement with the trial court's pretrial ruling and defendant's testimony "opening the door" to this testimony. Moreover, this testimony was relevant to defendant's knowledge that his actions could cause plaintiffs to suffer emotional distress. The trial court did, however, abuse its discretion by admitting testi-

mony from defendant's brother regarding the alleged "peeping Tom" incident because it was improper character evidence. MRE 404(a), (b); *Persichini v William Beaumont Hosp*, 238 Mich App 626, 632; 607 NW2d 100 (1999); *Gainey v Sieloff (On Remand)*, 163 Mich App 538, 553; 415 NW2d 268 (1987). Nevertheless, in light of the overwhelming evidence that defendant surreptitiously videotaped plaintiffs, who suffered emotional distress as a result, the error does not merit reversal because it does not affirmatively appear that failing to grant relief is inconsistent with substantial justice. *Chastain, supra.* Moreover, even assuming one or more other evidentiary errors, the errors did not combine to deny defendant substantial justice. MCR 2.613(A); *Haynes, supra* at 103.

### 1. SEXUALLY TRANSMITTED DISEASES

In response to defendant's pretrial motion in limine, plaintiffs argued that evidence of STDs added to their emotional distress of learning that they had been secretly videotaped having intimate relations with defendant. The trial court ruled that the evidence could be admitted "if there is evidence one or two of them . . . contracted it, and because they learned about the videotaping of others, their emotional distress would be greater because, obviously, if there's more partners, the fear is greater."

The testimony showed that plaintiff Dennis and defendant had contracted human papillomavirus (HPV) or genital warts. Plaintiff Lewis was diagnosed with gardnerella, a very common bacterial vaginal infection. Dennis testified that she contracted genital warts from defendant sometime before the videotaping in question, and that defendant acknowledged he

had genital warts many years before but did not
believe he still had them. Dennis testified that she for-
gave defendant for passing on genital warts because
defendant did not know he could transmit the dis-
ease. Further, Lewis's treating physician, Dr. Hinton,
testified that genital warts are difficult to diagnose in
males and can go undetected. Although Hinton testi-
fied that there was no cure for the viral infection, she
also acknowledged that it would not be unusual for a
person whose symptoms had been treated to believe
he was cured. Thus, the evidence supported defen-
dant's testimony that he contracted genital warts in
the 1980s, but after being treated he did not know he
still had them. Hinton confirmed that Lewis had
gardnerella when seen on August 11, 1999, but Lewis
did not have genital warts. Lewis testified that worry
about sexual diseases added to her fears and con-
cerns after learning of the videotape.

Thus, although the evidence was marginally proba-
tive, we cannot conclude there was no justification or
excuse for the ruling made. Nor can we say that the
admission of evidence of STDs in a case in which sex
was the dominant issue presented a substantial dan-
ger of unfair prejudice, or would have been given
undue or preemptive weight by the jury. In other
words, we cannot say that the trial court abused its
discretion on this close question. *Waknin, supra* at
332-334; *Peña, supra* at 303. Finally, even if the trial
court erred by admitting this evidence, it does not
affirmatively appear that declining to grant relief is
inconsistent with substantial justice. MCR 2.613(A);
*Chastain, supra.*

2. EVIDENCE OF DEFENDANT'S TEMPER AND PPO

At defendant's pretrial motion, the trial court ruled regarding evidence that "unless you can demonstrate that plaintiffs had knowledge of those PPOs before this lawsuit was filed . . . it's too far afield." During the testimony of defendant's sister, Pagi Pillen, the trial court overruled defense objections to questions concerning defendant's temper on the promise that plaintiffs would connect the evidence to the time frame at issue. The trial court also overruled defense objections that plaintiffs had not shown they knew of the problems between defendant and his sister. We note that there is nothing improper in and of itself with the trial court's reversal of its earlier evidentiary ruling. See, e.g., *People v Sabin (After Remand)*, 463 Mich 43, 58; 614 NW2d 888 (2000), citing *People v Vander-Vliet*, 444 Mich 52, 90-91; 508 NW2d 114 (1993), mod 445 Mich 1205 (1994), encouraging "trial courts to utilize a flexible approach for determining admissibility to facilitate the informed exercise of their discretion under MRE 403."

Thus, Pillen was permitted to testify about defendant's temper and that she failed in her effort to obtain a PPO. Defendant elicited on cross-examination of his brother, Herbert LeGrow, similar testimony concerning his temper. Both witnesses tied the evidence of defendant's temper directly to pertinent issues by describing defendant's angry efforts to retrieve the videotape at issue from Shemanski. Pillen testified:

*A.* I filed a PPO against my brother.

*Q.* Can you explain to the jury what a PPO is, please?

*A.* A personal protection order because he was calling me at work, he was calling me at home, he was calling me on

my cell phone, yellin' at me all the time because he wanted me to do something for him. I told him I didn't know any information, if I could help him I would, I couldn't help him, I didn't know what he wanted me to do. . . . I finally took my phone off the hook. Then he called me on the cell phone and people at work were startin' to get worried because he was calling me at work and screamin' at me at work and stuff and so I—I had enough. . . . So I filed a PPO against him . . . .

Q. Well, what information was he trying to get?

A. I'm not exactly for sure what he wanted. He wanted me to help him out with the situation and—and with this videotape and I didn't—All I know is of the videotape, I've never seen the videotape, . . . I don't know, other than what's going on here today, I never viewed it or anything.

Although on cross-examination Pillen denied that defendant specifically asked her to intervene on his behalf to obtain the videotape from Shemanski, it is clear from the context of Pillen's testimony that the repetitive telephone calls related to defendant's efforts to get Pillen involved in the videotape situation.

Herbert LeGrow's testimony on cross-examination by defendant was more direct. He described defendant as angry when defendant was yelling at Shemanski to give the videotape back, but not quite "frothin' at the mouth" like defendant had been when Herbert told a prospective girlfriend of defendant's that she was eighth or ninth in line.

Plaintiffs argue that this evidence was relevant not to show a reason for their fear, which would require their knowledge, but, rather, to show that the fear plaintiffs experienced after learning of the videotape was reasonable. Thus, Lewis testified that after the existence of the videotape became known, she feared defendant because "she knew he had a really bad

temper." Likewise, Shemanski testified that she experienced fear, that the incident caused her to have nightmares, and that defendant "totally blew a gasket" when she confronted him about the videotape. In sum, the evidence of defendant's temper and Pillen's effort to obtain a PPO were arguably admissible; therefore, the trial court did not abuse its discretion. *Waknin, supra* at 332-334; *Peña, supra* at 303. Again, even if the trial court erred by admitting this evidence, it does not affirmatively appear that declining to grant relief is inconsistent with substantial justice. MCR 2.613(A); *Chastain, supra.*

### 3. "PEEPING TOM" EVIDENCE

Herbert LeGrow testified that on one occasion, while he was staying at his brother's home, a girlfriend spent the night with Herbert. He concluded that defendant had spied on his activities because the next morning defendant commented that Herbert's girlfriend had pretty breasts. The trial court ruled that this evidence would be permitted "under MRE 404(b)(1) to show absence of mistake." The trial court's reasoning was flawed because defendant never claimed that his videotaping of plaintiffs was an accident. Rather, defendant admitted that he intentionally videotaped plaintiffs but that plaintiffs either expressly or impliedly consented to the taping. On appeal, plaintiffs, in essence, argue that the evidence was admitted to prove that in secretly videotaping plaintiffs, defendant acted in accordance with his flawed character. Dennis and Shemanski argue that the evidence showed defendant was a "voyeur" who secretly videotaped plaintiffs. Lewis argues that the purpose of the evidence was to show habit or routine,

and that the evidence showed a scheme, plan, or system. In other words, the evidence demonstrated that defendant acted in accordance with his character of being a voyeur.

Although this Court has authored conflicting opinions in the past regarding whether MRE 404(b) applies to civil cases, compare *Scott v Hurd-Corrigan Moving & Storage Co, Inc*, 103 Mich App 322; 302 NW2d 867 (1981), with *Cook . v Rontal*, 109 Mich App 220; 311 NW2d 333 (1981), the rule was amended in 1991 to clarify that it applies to criminal and civil cases. The staff comment to the 1991 amendment reads: "The 1991 amendment deleted 'the crime charged' and substituted 'the conduct at issue in the case' in subrule (b). The rule applies in civil cases even though it is used more often in criminal cases."

As applied to the instant case, MRE 404 clearly states the applicable general rule "prohibiting the *use* of evidence of specific acts to prove a person's character to show that the person acted in conformity with character on a particular occasion." *Sabin, supra* at 56 (emphasis in original). MRE 404(b)(1) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

Our Supreme Court in *VanderVliet, supra* at 74, established the analytical framework for the trial

court's difficult task of weeding out improper character evidence by applying the "safeguards already present in the Rules Of Evidence." Other bad acts evidence may be admitted where: (1) the evidence is offered for some purpose other than character to conduct, or a propensity theory; (2) the evidence is relevant (having any tendency to make the existence of a fact more or less probable) and material (relating to a fact of consequence to the trial); (3) the trial court determines under MRE 403 that the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice; and (4) the trial court may provide a limiting instruction under MRE 105. *Id.* at 55, 74-75. See also *Sabin, supra* at 55-59. Here, the evidence was not offered for a proper purpose; therefore, it was inadmissible. See, e.g., *Gainey, supra* at 552-553.

Although the testimony was improperly admitted, we conclude that reversal is not merited. It was undisputed that defendant videotaped plaintiffs, and the jury was presented with abundant direct evidence, including the testimony of each plaintiff and the testimony of defendant, regarding the critical issue whether plaintiffs consented to the taping. We cannot conclude that the speculation of defendant's brother based on an alleged offhand comment by defendant affected the outcome of this case, or that failing to grant relief is inconsistent with substantial justice. MCR 2.613(A).

### 4. EVIDENCE OF DEFENDANT'S PRIOR UNRELATED LAWSUIT

Defendant also moved to exclude evidence that he filed a wrongful discharge lawsuit alleging that his discharge caused him to suffer emotional distress.

Plaintiffs argued that the evidence was relevant to their claims of intentional infliction of emotional distress because it showed that defendant was aware that his actions could emotionally harm others. The trial court ruled that plaintiffs could not introduce this evidence unless defendant opened the door, stating that if the Defendant denied that emotional distress or mental anguish could arise without a physical cause, then the Plaintiffs would be able to ask him— "inquire of him if he didn't experience it himself" in connection with the lawsuit that he filed. After further colloquy between counsel and the court, defense counsel agreed that he could "live with that."

During cross-examination, defendant initially agreed that the videotapes were "very embarrassing." When asked if they were "shameful" and "humiliating," defendant responded by asking counsel to define the terms. Eventually, defendant agreed that if plaintiffs did not know they were being videotaped and later found out it would be "shameful, humiliating and embarrassing." However, defendant denied knowing if it would cause plaintiffs grief, worry, and concern. Defendant became argumentative with counsel, pointing out that his questions assumed facts and asked that questions be rephrased. Later, the following cross-examination of defendant occurred:

> *Q.* You would agree that a videotape that was secretly done of two people having sex, if that videotape was made public, would cause emotional distress?
>
> *A.* If a secret videotape was made?
>
> *Q.* Yes.
>
> *A.* It would cause emotional distr—I don't know if it would or not.
>
> *Q.* Would it to you?

*A.* Well, I'm not happy about it—ah—this videotape being exposed, so that's

*Q.* So your answer—

*A.* —gave me—

*Q.* —is yes?

*A.* —My—I have ang—mental anguish myself over this.

*Q.* May—Maybe I can—get you to actually answer a question. Yes, it would cause emotional distress, correct?

*A.* I don't know if it would cause emotional distress. I don't know the definition of emotional distress.

Counsel then asked defendant about his prior lawsuit, evoking an objection from defense counsel reminding the trial court that the parties had a pretrial ruling regarding this evidence. The trial court clearly believed that defendant had "opened the door" to this evidence by responding, "We did. Everybody knows exactly what they were. Thank you." The trial court did not abuse its discretion. It is settled that error requiring reversal may only be predicated on the trial court's actions and not upon alleged error to which the aggrieved party contributed by plan or negligence. *Smith v Musgrove*, 372 Mich 329, 337; 125 NW2d 869 (1964); *Farm Credit Services of Michigan's Heartland, PCA v Weldon*, 232 Mich App 662, 684; 591 NW2d 438 (1998). Defendant waived the alleged error by his coy answers to counsel's questions on cross-examination, knowing the trial court's ground rules to which his counsel had agreed.

Moreover, the evidence was relevant to plaintiffs' claims of intentional infliction of emotional distress to show that defendant was aware that his actions could cause emotional distress. *Graham, supra* at 674. Further, defendant's disclaimer of knowledge concerning emotional distress also opened the door

to counsel's cross-examination concerning defendant's own claim for emotional distress because it had a bearing on defendant's credibility. The credibility of witnesses is a material issue and evidence that shows bias or prejudice of a witness is always relevant. *Powell v St John Hosp*, 241 Mich App 64, 72; 614 NW2d 666 (2000).

## V. JURY INSTRUCTIONS

Defendant argues that the trial court erred by not reading M Civ JI 53.05, his requested instruction on mitigation of damages. We disagree.

### A. STANDARD OF REVIEW

This Court reviews claims of instructional error de novo. *Case v Consumers Power Co*, 463 Mich 1, 6; 615 NW2d 17 (2000). MCR 2.516(D)(2) states that the trial court must give a jury instruction if a party requests such instruction and it is applicable to the case. We review for abuse of discretion the trial court's determination whether a standard jury instruction is applicable and accurate. *Stevens v Veenstra*, 226 Mich App 441, 443; 573 NW2d 341 (1997). The trial court's jury instructions must include all the elements of the plaintiffs' claims and should not omit any material issues, defenses, or theories of the parties that the evidence supports. *Case, supra* at 6. Instructions not supported by the evidence should not be given. *Id.* If, on balance, the theories of the parties and the applicable law are adequately and fairly presented to the jury, no error requiring reversal occurs. *Id.* Reversal based on instructional error is only required where

the failure to reverse would be inconsistent with substantial justice. MCR 2.613(A); *Case, supra* at 6.

B. ANALYSIS

The trial court properly refused to read M Civ JI 53.05 because it was not applicable to this case. M Civ JI 53.05 provides:

> A person has a duty to use ordinary care to minimize his or her damages after [*he or she/his or her property*] has been [*injured/damaged*]. It is for you to decide whether plaintiff failed to use such ordinary care and, if so, whether any damage resulted from such failure. You must not compensate the plaintiff for any portion of [*his/her*] damages which resulted from [*his/her*] failure to use such care.

A mitigation of damages instruction is appropriate where the plaintiff fails to minimize her damages after she knows of the injury. *Gore, supra* at 742.

Defendant argues that the trial court should have read M Civ JI 53.05 because each plaintiff told other people about the videotape and that by doing so each plaintiff aggravated her injuries. Plaintiffs contend that the instruction was inapplicable because their injuries were due to the secret videotaping itself, not its publication. The trial court refused defendant's request, stating: "I don't think it really is the issue in the case and I think the only issue would be whether they needed and sought any type of counseling, and we know Miss Dennis did, so—and so I—I'm not giving it."

The trial court did not abuse its discretion by refusing to read M Civ JI 53.05 because plaintiffs' claims against defendant were not based on third parties either seeing or hearing about the videotape. Rather,

each plaintiff contended that defendant's act of secretly videotaping them having sex was the basis of their claims for damages. Plaintiffs claimed an invasion of privacy predicated upon the intrusion on their seclusion. Plaintiffs did not claim a public disclosure of private facts. In addition, each plaintiff claimed a violation of § 539d based on defendant's secret installation of a video camera, not on the publication of the contents of the videotape. Finally, plaintiffs' claims of intentional infliction of emotional distress were based on secret videotaping, not on publication. Because plaintiffs did not claim damages on the basis of a third party becoming aware of the videotape, defendant's mitigation defense was not applicable to this case. In other words, that plaintiffs discussed the videotape with others is not a defense to any of plaintiffs' claims. Therefore, the trial court did not abuse its discretion by declining to read the mitigation instruction.

### VI. CONCLUSION

In summary, we hold that § 539d was properly applied to the facts of this case. We also conclude that plaintiffs presented sufficient evidence to survive defendant's motions for summary disposition and directed verdict. Further, we find no trial error that merits reversal under the standard set forth in MCR 2.613(A). Therefore, we affirm.

CAVANAGH, J., concurred.

HOEKSTRA, J., *(concurring)*. I agree with the majority opinion in all respects, except with regard to certain portions of section IV, which addresses the trial court's evidentiary decisions. Despite my disagree-

ment concerning the relevancy of certain evidence, I concur, however, in the majority's result because I believe that declining to grant relief is not inconsistent with substantial justice. MCR 2.613(A); *Chastain v Gen Motors Corp*, 467 Mich 888; 654 NW2d 326 (2002); *Miller v Hensley*, 244 Mich App 528, 531; 624 NW2d 582 (2001).